UNITED STATES of America,

v.

Charles W. RAMSEY, Jr., Defendant.

No. CR. 95–0326(PLF).
No. CIV.A. 00–2066(PLF).

United States District Court,
District of Columbia.

July 1, 2004.

Charles W. Ramsey, Washington, DC, pro se.

Francis Darron Carter, Washington, DC, for Movant.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This matter is before the Court on defendant Charles W. Ramsey's motion for relief under 28 U.S.C. § 2255. Pursuant to that section, the Court shall vacate a conviction and grant appropriate relief where, *inter alia,* "there has been such a denial or infringement of the constitutional rights of the prisoner so as to render the judgment vulnerable to collateral attack." Mr. Ramsey claims that the deficient performance of his trial attorney denied him the "assistance of counsel" guaranteed him by the Sixth Amendment.

The Court has considered the briefs filed by two successive and very experienced criminal defense lawyers whom the Court appointed to assist the defendant in this matter: Francis S. Carter, Esquire, and Steven C. Tabackman, Esquire. The Court appreciates their service to Mr. Ramsey and to the Court. The Court also has considered the briefs and memoranda filed by the government, as well as the transcripts of the trial and sentencing and other relevant portions of the record. The Court held an evidentiary hearing on defendant's Section 2255 motion on April 2 and 5, 2004. The witnesses at the hearing were Mr. Ramsey and his retained trial counsel, Allan M. Palmer, Esquire, whose competence and effectiveness Mr. Ramsey

challenges on this motion. For the reasons that follow, the Court grants defendant's motion for relief under 28 U.S.C. § 2255.

## I. PROCEDURAL HISTORY

The defendant, Charles W. Ramsey, was charged in a two-count indictment with one count of possession with intent to distribute 500 grams or more of cocaine on November 21, 1995, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii), and one count of attempted possession with intent to distribute 500 grams or more of cocaine on the same date, in violation of 21 U.S.C. § 846. A jury trial began before this Court on May 14, 1996, and concluded on May 21, 1996, when the jury found the defendant guilty on the first count, possession with intent to distribute 500 grams or more of cocaine. As instructed, the jury accordingly did not consider the second count, attempted possession.

Before sentencing, the defendant filed a pro se motion for a new trial, arguing ineffective assistance of counsel. The Court appointed Mr. Carter to represent Mr. Ramsey on that motion and on appeal. In a Memorandum Opinion and Order dated June 27, 1997, the Court denied the motion for new trial because it had not been timely filed under Rule 33 of the Federal Rules of Criminal Procedure. After a subsequent hearing, the Court issued an Opinion and Order, dated December 15, 1997, rejecting all of Mr. Ramsey's sentencing-related arguments. The Court concluded that, under the relevant provisions of the United States Sentencing Guidelines and based upon the facts presented at trial, a total of 44 kilograms of cocaine was attributable to Mr. Ramsey for Guideline sentencing purposes. The Court denied the government's motion to depart upward under Section 4A1.3 of the Guidelines and, in view of Mr. Ramsey's criminal history, concluded that Mr. Ramsey should be sentenced within the Guideline range for a defendant with an Offense Level of 34 and Criminal History Category IV, 210 to 262 months. On December 19, 1997, the Court sentenced the defendant to 210 months' incarceration, followed by eight years of supervised release. The defendant appealed, and the court of appeals affirmed Mr. Ramsey's conviction and sentence on February 9, 1999. See United States v. Ramsey, 165 F.3d 980 (D.C.Cir.), cert. denied, 528 U.S. 894, 120 S.Ct. 223, 145 L.Ed.2d 187 (1999).

On August 16, 2000, the defendant filed a pro se motion for appointment of counsel and a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. He filed an amendment to that motion one month later. On September 22, 2000, the Court granted the defendant's motion for appointment of counsel and again appointed Mr. Carter to represent him. Various other papers subsequently were filed, some pro se and some by counsel, until, on August 16, 2002, the defendant filed a pro se motion seeking the replacement of his appointed counsel on the ground that counsel had a potential conflict of interest. On September 13, 2002, upon consideration of that motion and defense counsel's motion to withdraw, the Court granted the motion to withdraw. On October 20, 2002, the Court appointed defendant's present counsel, Steven Tabackman, to represent Mr. Ramsey. On September 6, 2003, the defendant, through his new counsel, filed a reply to the government's opposition to his motion for relief under Section 2255. The government filed a response on February 13, 2004, and the defendant filed a surreply on March 17, 2004. As noted, the hearing on the motion was held on April 2 and 5, 2004.

## II. THE TRIAL

In her opening statement at trial, the prosecutor told the jury that her primary

witness would be Francisco Fierro, a Miami drug dealer who had delivered drugs to the defendant in the District of Columbia on approximately eight occasions from 1992 to 1994. *See* Transcript of Ramsey Trial ("Tr.") at 138–39. The prosecutor explained that the relationship ended in 1995 when Fierro was arrested for attempted murder. *See id.* at 141. The prosecutor said that Mr. Fierro subsequently agreed with the United States Drug Enforcement Administration ("DEA") to try to sell drugs to Mr. Ramsey in an effort to help Fierro's brother-in-law, who was then serving a jail sentence, and to get a deal for himself on the attempted murder charge. *See id.* at 141–42. According to the prosecutor, Mr. Fierro, at DEA's urging, attempted to arrange a five-kilogram drug transaction with Mr. Ramsey. In furtherance of the plan to catch Mr. Ramsey in a drug deal, between September 1995 and November 21, 1995, Mr. Fierro held numerous telephone conversations with Mr. Ramsey, all of which were recorded on audiotape. There also were a number of face-to-face meetings that were videotaped. *See id.* at 142. Finally, the prosecutor indicated that Mr. Fierro would describe for the jury, and that the videotapes would show the transaction on November 21, 1995, which was the subject of the indictment. *See id.* at 143–44.

In his opening statement, Allan Palmer, defendant's lawyer, stated that Mr. Fierro's cooperation with the DEA was an attempt to obtain lenient treatment at a time when he was locked up without bond in a Miami jail charged with attempted murder and the use of a handgun during the commission of a felony. *See* Tr. at 146–47. Mr. Palmer stated that Mr. Fierro first unsuccessfully tried to induce some of his drug-dealer friends in Miami to buy or sell drugs, setting them up to be caught by the DEA. *See id.* at 147. According to

Mr. Palmer, Mr. Fierro, unable to make a case against anyone in Miami, devised a scheme to "set up" Mr. Ramsey. As part of the scheme, Fierro urged Mr. Ramsey to pose as a big-time drug dealer when introduced to Fierro's out-of-town drug connection, even though Fierro knew Ramsey had stopped selling drugs years earlier. *See id.* at 149–51. It was for this reason, according to Mr. Palmer, that Mr. Ramsey did in fact appear to be a drug dealer talking about drugs on some of the audiotapes and videotapes. *See id.* at 150. In sum, Mr. Palmer told the jury in his opening statement: "[Y]ou will determine whether or not Charles Ramsey was set up, entrapped into receiving these drugs from Francisco and whether or not he intended to distribute or sell them in the street." *Id.* at 152.

Francisco Fierro was the government's primary witness at trial. He testified that he had delivered drugs to the defendant eight times between 1993 and 1994, selling him a total of 39 kilograms of cocaine during that period. *See* Tr. at 259–74. While the first delivery was for a small amount, the subsequent deliveries were, in each instance, of amounts between one and ten kilograms of cocaine at a price of approximately $20,000 per kilogram. *See id.* at 265, 270. Mr. Fierro generally would meet with Mr. Ramsey in a hotel room, where Fierro would give him one or two kilograms of cocaine; Ramsey then would leave, sell the drugs over a period of hours or days, and return later with payment. *See id.* at 265–67, 270–71. This procedure is known as "fronting" the drugs. Once Mr. Fierro had received his money, he would "front" the defendant another one or two kilograms of cocaine. *See id.* Fierro testified that in 1994 he left the drug trade but returned in September of 1995 to assist the DEA in a "reverse" undercover

operation against Mr. Ramsey. *See id.* at 274–81.

Fierro and Agent Robert Valentine both testified about several face-to-face meetings and numerous telephone conversations Fierro had had with the defendant from late-September 1995 until the date of defendant's arrest on November 21, 1995. Most of the conversations were recorded. *See* Tr. at 281–82, 287–88. On one occasion, on September 25, 1995, the defendant and Mr. Fierro met in a hotel room and discussed a five-kilogram cocaine deal. Fierro told Mr. Ramsey that a drug distributor named "Tony" (in reality DEA undercover Agent Robert Valentine) required payment in advance. *See* Tr. at 311–12, 317–19, 323–24 (Fierro testimony). Ramsey responded that he had no money to pay for drugs. *See* Tr. at 403–04. This meeting was videotaped. *See id.* at 311–12. On October 6, 1995, the defendant met with "Tony" (Agent Valentine) at a restaurant, they discussed a five-kilogram deal, and the defendant asked that the drugs be "fronted." *See* Tr. at 453–58 (Valentine testimony). On October 24, 1995, Mr. Ramsey met Agent Valentine and Mr. Fierro at a hotel in Washington, D.C. In an audiotaped conversation, the defendant asked to see the cocaine and Valentine showed him five kilograms, but ultimately Ramsey refused to pay for it except under the fronting arrangement. *See id.* at 458–63. On November 2, 1995, Agent Valentine and Mr. Ramsey met in Valentine's car and Valentine again showed him five kilograms of cocaine. This meeting also was videotaped. *See id.* at 463–69.

Because of statements Mr. Ramsey had made at a number of these meetings, the DEA concluded that Ramsey preferred to deal solely with Mr. Fierro and that he would not deal unless the drugs were fronted. *See* Tr. at 516–19. As a result, the testimony showed, the DEA pulled

Agent Valentine out of the operation and instructed Mr. Fierro to arrange to sell drugs to Mr. Ramsey under his old procedure. Fierro contacted Ramsey on November 15, 1995, and offered to front him five kilograms of cocaine. Ramsey and Fierro agreed to meet on November 21, 1995, and did in fact meet on that day in a hotel room in Washington, D.C.; this meeting was videotaped. *See* Tr. at 336–40; 377–78. Fierro showed the defendant five one-kilogram bricks of cocaine, and they agreed on a price of $20,000 for each brick. The defendant agreed to take two kilograms at that time and to return later for the other three. *See id.* at 377–78. The defendant placed two bricks of cocaine inside a duffle bag and left the hotel room. He was arrested by DEA agents in the corridor.

At trial, the credibility of Mr. Fierro and certain of the DEA agents was the focus of the defense. Notably, Mr. Fierro testified on cross-examination that he had worked with the narcotics squad of the State Police in Florida, introducing targets of crack cocaine investigations to undercover police officers. *See* Tr. at 416–17, 422–25. He testified, however, that he had never told anyone at the DEA, except possibly for Agent Curtis, that he was working for the state police. *See id.* at 425–26. Agent Valentine testified that he knew nothing about Fierro's cooperation with the Florida State Police. *See id.* at 498. Mr. Fierro testified that he had agreed to participate in the DEA sting against Mr. Ramsey as part of a deal arranged with the Florida State Attorney's Office, according to which Mr. Fierro would receive probation on his then-pending charge of attempted murder. *See* Tr. at 276–77. The DEA agents testified, however, that they had not sought lenient treatment for Mr. Fierro from the Florida State Attorney and that participation in the sting had not been discussed with the State Attorney's Office. *See id.*

at 187–190, 192–93, 214. Mr. James Cobb, an Assistant State Attorney in Florida, contradicted this testimony. Mr. Cobb testified that he had received indeed a call from DEA Agent Curtis and had been asked by the DEA to give Mr. Fierro a lenient plea deal so that Fierro could be released to travel outside the state to assist "on a really big case." Tr. at 360–62.[1]

On the day the prosecutor announced her intention to call Mr. Cobb as a witness, she gave to Mr. Palmer the file Mr. Cobb had maintained in the Fierro case. Mr. Palmer immediately expressed dismay at the prospect of having Mr. Cobb testify without the defense first being provided an adequate opportunity to review the file, stating that "it would take me about three hours to read this file." Tr. at 350. The Court then announced that it would provide the defense an adequate period of time within which to do so, at least until after lunch. See id. at 350–51. Mr. Palmer declined to take advantage of the offer and instead agreed that Mr. Cobb's testimony should be taken immediately, "because I guess in the long run it's really not too relevant to our case." Id. at 351. The Court then explained the potential relevance of the testimony, noting specifically that if Mr. Cobb testified "inconsistent[ly] with what any of the DEA agents said, then it goes to their credibility." Id. Further, "I think it goes to both Fierro's credibility, motivation and incentive to push Mr. Ramsey to do something he might not want to have done." Id. at 352. Mr. Palmer was unmoved, suggesting that "we should start cranking it up now and move the case." Id. at 352.

On Thursday, May 16, 1996, while Agent Valentine was testifying, the prosecutor asked him to read a statement that Mr. Ramsey had made to Valentine and Agent McGrath the evening of Ramsey's arrest. See Tr. at 470–71. In the statement, Mr. Ramsey admitted to having had several meetings with "Tony" and Fierro for the purpose of negotiating sales of cocaine among the three men. See id. at 476–77. Mr. Palmer made no objection to the reading of the statement at that time. Nor had he moved to suppress the statement before trial because he thought (erroneously, as it turned out) that Mr. Ramsey had waived his Miranda rights, and because Mr. Palmer concluded that the statement was voluntary. See Tr. at 471–73.

The next day, Agent Robert Woods testified that after Mr. Ramsey's arrest, and some time before Ramsey spoke to Agent Valentine, Woods had advised Ramsey of his Miranda rights and Mr. Ramsey declined to make any statement. See Tr. at 578–81, 598. Both the prosecutor and defense counsel were surprised by this testimony. See Tr. at 642–43. Initially, both had assumed that Ramsey had waived his rights when speaking with Agent Woods, and that Agents Valentine and McGrath later had re-advised Ramsey of his rights, he had waived them again, and had proceeded to make a statement. See id. at 644. After hearing this testimony, Mr. Palmer looked more closely at the statement and the advice-of-rights card completed by Valentine and McGrath. He noticed for the first time that Mr. Ramsey had given his statement at 7:45 p.m. but

---

1. On cross-examination, Agent Curtis said that while he personally had contacted the Florida State Attorney's Office, he simply had asked permission to utilize Mr. Fierro's services in connection with a federal investigation. See Tr. at 188–89. He denied having any input with respect to Fierro's state sentence either before or after Fierro provided assistance to the DEA and stated he had nothing to do with Fierro getting probation in Miami. See id. at 188–91. Agent Curtis reaffirmed this testimony on redirect. See id. at 192–93.

did not sign the waiver form until 8:15 p.m., *after* the statement was given. *See* Tr. at 644. The times on the statement (7:45 p.m.) and on the waiver-of-rights card (8:15 p.m.) clearly indicated that Mr. Ramsey had waived his rights *after* giving the statement, not before.

On Monday, May 20, the Court heard additional testimony from Agent Woods and Agent Valentine outside the presence of the jury. Agent Woods testified that he had advised the defendant of his *Miranda* rights inside the hotel room immediately after his arrest, and that Mr. Ramsey had stated that he understood his rights but did not want to waive them or answer any questions; Agent Woods therefore asked him no questions. *See* Tr. at 667–68. Agent Woods further testified that after the defendant was taken to the DEA, at about 7:15 or 7:30 p.m., the defendant asked to speak to "Tony" (Agent Valentine), and Agent Woods got Valentine and brought him into the interrogation room. *See id.* at 671–72, 678. Agent Valentine testified that before entering the room he asked Agent Woods whether he had advised Mr. Ramsey of his rights and Woods said that he had. *See id.* at 680–81. Valentine then entered the interrogation room and asked Ramsey if he wanted to speak to him; Ramsey said yes, so Woods took a statement and asked Agent McGrath to write down what Ramsey said. *See id.* at 682–83. While taking the statement, Valentine realized that he had never seen a written waiver-of-rights, so he again asked Woods if Ramsey had signed one and this time was told that he had not. *See* Tr. at 683–84. Still believing that Mr. Ramsey had orally waived his rights, Valentine re-advised Ramsey of his *Miranda* rights about a third of the way into taking the statement. *See id.* at 684–85. Agent Valentine never knew that Ramsey had declined to waive his rights and declined make a statement after being advised by

Woods. *See id.* at 688. Agent Valentine testified that if Agent Woods had told him that Ramsey had declined to make a statement Valentine never would have interrogated him. *See id.* at 689. After hearing the arguments of counsel, the Court suppressed the statement. *See* Tr. at 708–12.

Almost immediately, Mr. Palmer made clear that he did not want a mistrial. Maintaining that the statement the jury already had heard had not "done that much damage," Mr. Palmer went on to say, "[j]ust indicate to the jury that it's been withdrawn and they should not consider it. We're not moving know [*sic*] a mistrial or anything like that." Tr. at 712. The prosecutor then requested that Mr. Ramsey personally be asked by the Court whether he was comfortable with the decision not to ask for a mistrial. The Court addressed Mr. Ramsey, explained the options available to him, and asked Mr. Ramsey to "take about ten minutes" to discuss the matter with Mr. Palmer. Tr. at 713–14. Mr. Palmer again immediately interjected, saying that the ten minutes were not necessary, and that he knew what Mr. Ramsey's answer would be. *See id.* at 714. The Court then again inquired of Mr. Ramsey, whereupon Mr. Ramsey stated his decision to continue with the trial, before the same jury. *See id.* A cautionary instruction was given to the jury, advising the jurors not to consider the statement in their deliberations.

Before the defense rested, the Court and counsel discussed the evidence on predisposition that might be admitted if the defendant decided to testify in support of his entrapment defense. *See* Tr. at 612–26, 631–38. The Court reviewed the case law with respect to the law of predisposition in entrapment cases and announced its tentative conclusion about what evidence of predisposition—and particularly what prior convictions—it would admit if

the defendant testified. *See* Tr. at 638–42. Before adjourning for the weekend, the Court addressed Mr. Ramsey personally about what evidence of predisposition would be admitted if he testified and pursued an entrapment defense. *See* Tr. at 654–55. The defendant indicated that he "would like to discuss it with Mr. Palmer and sleep on it over the weekend." Tr. at 655.

On Monday morning, the Court reiterated its ruling with respect to predisposition. *See* Tr. at 715–16. Mr. Palmer announced that, in view of the Court's ruling, Mr. Ramsey would not testify. *See id.* at 718–19. The Court commented: "Well, then what's his defense? You've known from day one that this was an entrapment case" and that at least some of this predisposition evidence therefore would come in. *See id.* at 719–20. After extensive dialogue with counsel in the presence of the defendant, the Court took a recess to permit counsel to consult with his client. *See id.* at 716–21. After further discussion following the recess, Mr. Palmer announced that the defendant would not testify, the defendant confirmed that representation personally, and the defense rested. *See* Tr. at 731.

### III.  DISCUSSION

#### A.  *Defendant's Claims that Because of the Pervasiveness of Counsel's Errors, He Need Not Show Prejudice*

On this post-conviction challenge to his conviction under 28 U.S.C. § 2255, the defendant alleges that he was denied his Sixth Amendment right to the effective assistance of counsel. He ultimately made three arguments. First, he argued that his retained attorney, Allan Palmer, suffered from a conflict of interest that interfered with his representation of Ramsey in preparation for and at trial. Specifically,

he asserted that because Mr. Palmer was about to leave the practice of law and was preoccupied with preparing to go into a non-law-related business, he was focused on that business and not on his obligations to Mr. Ramsey; Mr. Palmer therefore wanted the trial over as quickly as possible. After hearing the testimony of Mr. Palmer at the evidentiary hearing on this motion, however, Mr. Ramsey abandoned this argument.

█  Second, the defendant argued that Mr. Palmer's failures at trial were of such a magnitude and so pervasive that prejudice may be presumed. He relied on the Supreme Court's decision in *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), in which the Court held that where counsel is absent from the proceedings or prevented from assisting the accused at a critical stage, where counsel's presence is so useless that the defendant for all intents and purposes is without a lawyer, or where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," then courts evaluating the defendant's ineffective assistance claim may presume that a competent lawyer could have achieved a different result at trial and no specific showing of prejudice is required. *Id.* at 658–59 n. 25, 104 S.Ct. 2039; *see also Mickens v. Taylor*, 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). Stated differently, courts can have no confidence in the outcome of a trial when counsel completely abandons the needs of his client, regardless of the evidence against the accused. When that occurs, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. *Mickens v. Taylor*, 535 U.S. at 166, 122 S.Ct. 1237.

The Court concludes that whatever Mr. Palmer's deficiencies, they were not so dramatic as to amount to providing Mr.

Ramsey with no representation at all. *See United States v. Thompson,* 27 F.3d 671, 676 (D.C.Cir.1994) (*Cronic* exception reserved for "a very narrow spectrum of cases"). Mr. Palmer cross-examined witnesses, argued successfully that Mr. Ramsey's statement should be suppressed, and delivered a reasonably well-crafted closing argument that properly focused on the credibility of Mr. Fierro. Although Mr. Palmer's performance suffered from many failings, some quite egregious, his overall performance does not fall so far below professional standards as to require the grant of relief to Mr. Ramsey without a specific showing of prejudice.

### B. Deficient Performance Under Strickland

The defendant also argues that under the traditional analysis of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), he was denied the effective assistance of counsel because Mr. Palmer's performance fell below the objective standard of reasonableness that any competent defense attorney would exercise and that his performance therefore was deficient. Counsel's performance, defendant asserts, "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. at 686, 104 S.Ct. 2052. His primary argument in this regard—although, as will be discussed, it must be viewed in the context of all of the other deficiencies asserted—is that Mr. Palmer's failure to move for a mistrial after the Court suppressed a statement already heard by the jury, opting instead for a limiting instruction, was so incompe-

tent and so ineffective as to require relief. Furthermore, Mr. Ramsey suggests, Mr. Palmer's explanation for this decision demonstrates that it could not have been for strategic or tactical reasons and only serves to underscore his incompetence.

■ The Court agrees that Mr. Palmer's failure to move for a mistrial after the Court suppressed the statement mid-trial, in conjunction with (i) his failure to understand the implications of raising an entrapment defense in his opening statement, and then failing to call the defendant as a witness after finally realizing the nature and scope of the predisposition evidence that would be admitted if Ramsey testified, and (ii) his failure to accept the Court's offer during the trial to give him time to review a voluminous file belatedly made available by the government, together demonstrate "errors so serious that counsel was not functioning as the 'counsel' granted the defendant by the Sixth Amendment." *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. 2052. *See also United States v. Williams,* 358 F.3d 956, 962 (D.C.Cir.2004) (*Strickland* measures reasonableness under " 'prevailing professional norms,' " 466 U.S. at 688, 104 S.Ct. 2052, which norms "require that an attorney 'inform[ ] himself . . . fully on the facts and the law.' ").

■ In making this determination, the Court is mindful of the Supreme Court's instruction that review of the effectiveness of counsel's performance must be "highly deferential." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. 2052.[2] *Strickland* does not require deference, however,

**2.** When counsel's error was motivated by a "reasonable" strategic decision, the error does not amount to deficient performance, let alone ineffective assistance of counsel, under *Strickland. See Burger v. Kemp,* 483 U.S. 776, 794–95, 107 S.Ct. 3114, 97 L.Ed.2d 638

(1987); *Smith v. Murray,* 477 U.S. 527, 534–37, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); CHARLES H. WHITEBREAD & CHRISTOPHER SLOBOGIN, CRIMINAL PROCEDURE: AN ANALYSIS OF CASES AND CONCEPTS § 32.04(c)(2), at 954–58 (4th ed.2000).

"when there is no conceivable strategic purpose that would explain counsel's conduct." *Moore v. Johnson*, 194 F.3d 586, 617 (5th Cir.1999). The Court in this case has not simply second-guessed defense counsel's unsuccessful trial strategy; on the contrary, the Court concludes that Mr. Palmer's assistance was ineffective because Mr. Palmer had *no* strategy, or at least no strategy that could pass as anywhere near objectively reasonable. *See Kimmelman v. Morrison*, 477 U.S. 365, 385–86, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *United States v. Cronic*, 839 F.2d 1401, 1403–04 (10th Cir.1988).

At the hearing on Mr. Ramsey's Section 2255 motion, Mr. Palmer attempted to explain his decision not to ask for a mistrial after learning that the defendant's statement had been taken in violation of *Miranda*. Counsel reiterated his view that the statement had not done much damage, and added two further points. First, Mr. Palmer testified that he thought the jurors might be more favorably disposed to his client's position that the police manipulated him into committing the crime—his entrapment defense—if they were informed that there was a problem with the statement. The jury might infer from the limiting instruction, according to Mr. Palmer, that law enforcement officers who would do something to make Mr. Ramsey's statement inadmissible might also do something to set up an innocent person. Second, Mr. Palmer contended that he was motivated by the desire to take advantage of his opening statement. The opening statement had focused on the defense's contention that Mr. Ramsey had been entrapped—a contention it appeared by that point in the trial the defense was no longer able to pursue through the testimony of Mr. Ramsey. Nevertheless, Mr. Palmer said he thought the opening statement's references to entrapment might resonate with the jury, even though the jury would have no evidence of entrapment.[3] Curiously, Mr. Palmer advanced these supposed strategic reasons all the while maintaining that his feeling throughout the trial was that Mr. Ramsey's case was "unwinnable."

The Court finds Mr. Palmer's explanations to be mere *post hoc* rationalizations for his deficient representation. The proffered reasons are so nonsensical that the Court is left to conclude that Mr. Palmer simply abandoned what he had decided at some point during the trial was an unwinnable case, and had been unwilling to invest the time and effort that would be required by a second trial. Mr. Palmer testified at the evidentiary hearing that the potential advantage Mr. Ramsey would receive in a second trial or by the additional opportunity to consider the possibility of a plea were never substantial considerations in Mr. Palmer's analysis.

Put simply, there was no reason for Mr. Palmer not to ask for a mistrial once Mr. Ramsey's statement, already having been heard by the jury, was suppressed because of the *Miranda* violation. *See Kimmelman v. Morrison*, 477 U.S. at 385–87, 106 S.Ct. 2574 (finding an attorney's representation deficient when, for no strategic reason, he failed to seek suppression of dam-

---

**3.** The Court notes that a second trial's opening statement would have had to have been different because counsel would not have been permitted to state that jurors were about to hear a defense that counsel knew would fail to materialize. Counsel would not ethically have been able to present entrapment as a defense in his opening statement at a second trial since the Court by then had educated him on the law of entrapment and predisposition and already had ruled on what predisposition evidence would be admitted if the defendant testified that he was entrapped; and the defendant already had decided not to testify in view of that ruling.

aging evidence); *United States v. Hylton,* 294 F.3d 130, 134 (D.C.Cir.2002) (failure to raise *Kastigar* to exclude government witness "was simply inexcusable.... [counsel's] decision was not a tactical one but instead rested on a misunderstanding of *Kastigar.*"). Further, Mr. Palmer had delivered an opening statement telling the jury that Mr. Ramsey was entrapped into committing the offense charged. After being told by the Court that offering an entrapment defense would allow the government to prove predisposition by, *inter alia,* Mr. Ramsey's numerous prior drug convictions, however, Mr. Palmer effectively abandoned that defense mid-trial and urged Mr. Ramsey not to testify—again, after already having told the jury that the defense was entrapment, a defense ordinarily supported by the defendant's testimony of the pressure put on him by agents of law enforcement. *See United States v. Burkley,* 591 F.2d 903, 921–22 (D.C.Cir. 1978). Mr. Palmer's abandonment of the entrapment defense after being tutored by the Court on the law and its implications for the admissibility of predisposition evidence "reflected ignorance of the law, rather than a *reasonable* strategic decision within 'the wide range of professionally competent assistance.'" *United States v. Williams,* 358 F.3d at 964 (quoting *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. 2052) (emphasis in original).

Mr. Palmer not only abandoned the defense he had presented to the jury in his opening statement, but he did not replace it with anything other than attacking the credibility of the informant, Fierro. Even that he did half-heartedly, not even taking the time offered to him by the Court to review the file of Assistant State Attorney Cobb concerning Mr. Fierro. Under all of these circumstances, any reasonable defense lawyer would have jumped at the chance to start the trial afresh, at which time some of the effects of Mr. Palmer's astounding lack of preparation, knowledge of the law, and misguided or uninformed decisions could have been mitigated.

Not only should Mr. Palmer have weighed these considerations in evaluating the Court's invitation to move for a mistrial, the admission of the statement prompting the Court's mistrial suggestion was so damaging in itself that a mistrial motion would have been the only appropriate avenue for a competent defense lawyer committed to his client's cause. Confessions or, to be precise, inculpatory statements made by the defendant, are particularly damaging pieces of evidence, and where such a statement has reached the jury there is always a substantial risk that the jury will consider it despite an instruction not to do so. *Cf. Sims v. United States,* 405 F.2d 1381, 1382–83 (D.C.Cir.1968) (per curiam) (noting "the hollowness of ... cautionary instructions" in *Bruton* context) (citing *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). If Mr. Palmer did have a "strategy," his decision not to ask for a mistrial was a choice to allow the jury to evaluate Mr. Ramsey's entrapment defense (which Mr. Palmer hoped the jury would still consider despite its effective abandonment), knowing that it would also consider Mr. Ramsey's admission that he met with Fierro and Valentine on several prior occasions to arrange drug sales. Any reasonable defense attorney would have advocated forcefully for a mistrial and the chance to have a new trial with a jury that would not hear the statement at all. Seeking a mistrial was "so to speak, a freebie; it [would have] cost the defense nothing and the possible benefit ... was undoubtedly significant." *United States v. Hylton,* 294 F.3d at 134.

The Court would have granted a mistrial had Mr. Palmer requested one to eliminate the effect of the jury's hearing the inadmissible statement. *See United States v.*

*Tarantino,* 846 F.2d 1384, 1413 (D.C.Cir. 1988) (discussing the importance of prejudice in the decision whether to grant a mistrial). Based upon the foregoing, the Court concludes that the first prong of *Strickland* is satisfied, as Mr. Palmer's performance fell well below the "objective standard of reasonableness" required of competent counsel. *Strickland v. Washington,* 466 U.S. at 688, 104 S.Ct. 2052. The remaining question is whether this deficient performance caused Mr. Ramsey prejudice.[4]

### C. Prejudice Under Strickland

█ To succeed on the prejudice prong of *Strickland,* Mr. Ramsey must show that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. 2052. This question turns on the application of the Supreme Court's dictum that a defendant is prejudiced when there is a reasonable probability that "the result of the proceeding would have been different"

but for counsel's unprofessional errors. *Id.* at 694, 104 S.Ct. 2052.

█ Mr. Ramsey's current counsel argues that the reasonable probability of a mistrial—regardless of the outcome of any retrial—is enough to satisfy the prejudice prong of *Strickland* because "the result" or outcome of Mr. Ramsey's trial would have been different: there would have been a mistrial rather than a conviction. If there had been a mistrial, counsel offers, anything could have happened before a second trial. Mr. Fierro could have died, for example. Most significantly, a competent defense attorney having reviewed the transcript of the first trial, surely would have discussed the pros and cons of a plea with Mr. Ramsey and likely would have strongly urged him to plead guilty. A plea would have reduced the sentencing range under the United States Sentencing Guidelines from 210 to 262 months to 168 to 210 months.[5]

The government responds that a different result or outcome must be an acquittal rather than a conviction and that the grant of a mistrial would not be enough to satisfy the prejudice prong of *Strickland.* After

---

**4.** Further independent evidence that Mr. Palmer's representation was deficient was his refusal to invest the time offered to him by the Court to prepare for the cross-examination of a witness—Assistant State Attorney James Cobb—crucial to attacking the credibility of both the informant and the law enforcement agents testifying against Mr. Ramsey, leaving it to the Court to suggest the ways in which Mr. Cobb's file could assist the defense. *See supra* at 32–33. Such representation was inexcusable and substantially below objective standards of reasonable advocacy. *See United States ex rel. Williams v. Brown,* 721 F.2d 1115, 1120 (7th Cir.1983).

Yet another independently significant deficiency was Mr. Palmer's failure to research and/or understand the relevant law on entrapment and predisposition evidence at the time he made his opening statement, a failing that ultimately led to his effective abandonment of

his only substantial defense just before he presented the defense case.

**5.** Mr. Ramsey had a criminal history category of IV. After trial, his sentence was computed using an offense level of 34. Had he pleaded guilty, he would have received at least a two-level reduction for his acceptance of responsibility, making the offense level 32. *See* U.S.S.G. § 3E1.1. The Court sentenced him at the low end of the Guidelines after trial. If it had sentenced him at the low end after a plea (168 months), the defendant's sentence would be 42 months shorter than the sentence he is now serving. Had he received a three-level adjustment for acceptance of responsibility after a plea, his Guideline sentencing range would have been 151 to 188 months, potentially resulting in 59 fewer months' incarceration, a sentence reduction of nearly five years.

all, *Strickland* states that the question under the second prong is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland v. Washington*, 466 U.S. at 695, 104 S.Ct. 2052.[6] In the case of a mistrial, the government argues, "the factfinder" necessarily would have been the new jury at a second trial. Thus, in the government's view, the mistrial and the potential plea are not the touchstones for analysis under *Strickland.*

As already stated, the Court would have granted the motion for a mistrial if Mr. Palmer or the defendant had made such a motion. Thus, the result of the first trial would have been different. One can assume, however, that upon retrial there was *not* a reasonable probability of an acquittal if Mr. Fierro and the DEA agents testified at the second trial essentially as they had at the first and the video and audiotapes were admitted in evidence as surely they would have been.[7] This case thus directly presents the question whether *Strickland's* use of "the proceeding" means that a defendant must demonstrate that the decision by a *different* factfinder at a *different* trial would likely have been an acquittal, or whether, at least in some situations, the denial of a significant procedural right by virtue of defense counsel's incompetence (in this case a mistrial) is sufficient to satisfy the prejudice prong of *Strickland.*

There is a strong and understandable force behind the idea that post-conviction relief should be reserved for those defendants who may not have committed the crimes for which they have been convicted, and it seems intuitively peculiar to refer to a defendant as "prejudiced" when the almost certain end result of a retrial—conviction—would be identical to the result he received while represented by deficient counsel. *See Kimmelman v. Morrison*, 477 U.S. at 394–97, 106 S.Ct. 2574 (Powell, J., concurring in judgment); *cf. Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (holding that Fourth Amendment violations that should have led to the exclusion of reliable evidence do not constitute grounds for habeas relief). Further, if the Sixth Amendment guarantee is in place to assure fair trials—and the Supreme Court has said that it is, *see Mickens v. Taylor*, 535 U.S. at 166, 122 S.Ct. 1237 (quoting *United States v. Cronic*, 466 U.S. at 658, 104 S.Ct. 2039)—it is reasonable at least to assess whether the defendant was the victim of some unfairness in his trial. *See Williams v. Taylor*, 529 U.S. 362, 391–93, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Lockhart v. Fretwell*, 506 U.S. at 369–72, 113 S.Ct. 838. Arguably, Mr. Ramsey was not the victim of unfairness *in the result*; he was found guilty and likely (if the same evidence were presented) would be found guilty again. If the evidence against the defendant was so overwhelming, it is difficult to maintain that he was deprived of a trial "whose result is reliable." *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. 2052; *see also Kimmelman v. Morrison*,

---

6. This statement notwithstanding, it is settled that some "results" other than guilt determinations trigger the *Strickland* prejudice analysis. *See Kimmelman v. Morrison*, 477 U.S. at 381, 106 S.Ct. 2574. For example, deficient performance resulting in a death sentence for the client may constitute ineffective assistance if there is a reasonable probability of a different *sentence* with competent representation, even if there is no possibility of an acquittal. *See Lockhart v. Fretwell*, 506 U.S. 364, 369–70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

7. Even Mr. Ramsey concedes that "this was ... a difficult case." Defendant Charles W. Ramsey's Reply to Government's Opposition to His Motion for Relief Under 28 U.S.C. § 2255 at 36 n. 45.

477 U.S. at 374, 106 S.Ct. 2574 (stating prejudice test as whether "the verdict [was] rendered suspect"). Indeed, a contrary decision might be taken as giving the defendant a "windfall to which [he is] not entitle[d]." *Lockhart v. Fretwell,* 506 U.S. at 366, 113 S.Ct. 838.[8]

The case law suggests, however, that Mr. Ramsey's obvious guilt may not bar his entitlement to relief under Section 2255. If Mr. Palmer's errors "deprive[d] [Mr. Ramsey] of a substantive or procedural right to which the law entitle[d] him," it matters not whether his conviction ultimately is "fair." *Williams v. Taylor,* 529 U.S. at 393, 120 S.Ct. 1495; *see also id.* at 397–98, 120 S.Ct. 1495. In *Williams v. Taylor,* the defendant was deprived of the right to provide the jury with mitigating evidence that "his trial counsel either failed to discover or failed to offer." *Id.* Here, the question is whether Mr. Palmer's failure to request a mistrial deprived Mr. Ramsey of any similar right.

Mr. Palmer's most serious error was in permitting the jury to pronounce Mr. Ramsey's guilt when he had an opportunity to avoid that result by seeking a mistrial. In that respect, his deficient performance in failing to move for a mistrial is analogous to a defense lawyer's deficient performance in counseling against or in rejecting an obviously beneficial plea offer to a guilty defendant, or in failing to appeal a conviction. In both of those situations, the effective advocate seeks to take the client's liberty out of the hands of the jury. *See Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (stating test as "whether counsel's constitutionally ineffective performance affected the outcome of the plea process"); *Smith v. United States,* 348 F.3d 545, 551 (6th Cir.2003) (applying *Hill v. Lockhart* test to conclude that failure of defense counsel to "provide professional guidance … regarding his sentence exposure prior to a plea may constitute deficient assistance") (internal quotation omitted); *Page v. United States,* 884 F.2d 300, 302 (7th Cir.1989) (stating test as whether the result of the appeal would have been different). *See also Roe v. Flores–Ortega,* 528 U.S. 470, 484, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (finding prejudice where, but for counsel's errors, the client would have appealed). Relief under Section 2255 thus does not turn on the defendant's actual innocence in these situations. *See Kimmelman v. Morrison,* 477 U.S. at 381, 106 S.Ct. 2574 ("[W]e decline to hold either that the guarantee of effective assistance of counsel belongs only to the innocent or that it attaches only to matters affecting the determination of actual guilt.").

Specifically, in the terminology of *Lockhart v. Fretwell,* the second trial that would have been obtained by Mr. Palmer's having requested, and the Court having granted, a mistrial was a "procedural right to which the law entitle[d]" Mr. Ramsey, in the same way that a retrial after appellate reversal or a plea not taken because of ineffective advice provided by counsel are procedural rights. *See Lockhart v. Fretwell,* 506 U.S. at 372, 113 S.Ct. 838. Mr. Palmer's deficient conduct deprived Mr. Ramsey of the opportunity for a second trial he otherwise would have had, untainted by the evidence Mr. Palmer should have sought to exclude even before the

---

**8.** Justice Marshall, arguing that defendants whose representation was deficient should receive new trials regardless of prejudice, characterized *Strickland* as denying relief whenever the defendant is "manifestly guilty." *Strickland v. Washington,* 466 U.S. at 711, 104 S.Ct. 2052 (Marshall, J., dissenting); *see also id.* ("[T]he assumption on which the Court's holding rests is that the only purpose of the constitutional guarantee of effective assistance of counsel is to reduce the chance that innocent persons will be convicted.").

trial began and untainted by an opening statement to the jury of an entrapment defense he could not present. *See Roe v. Flores–Ortega,* 528 U.S. at 483, 120 S.Ct. 1029 ( [C]ounsel's deficient performance has deprived [the defendant] of more than a *fair* judicial proceeding; that deficiency deprived [him] of the appellate proceeding altogether.") (emphasis in original). The Court concludes that the reasonable probability—actually the certainty (*see supra* at 37–38)—that a mistrial in this case would have been granted is sufficient to demonstrate prejudice.[9]

▮ The Court finds the analogy to the appeal cases persuasive. The failure of trial counsel to file a timely notice of appeal when requested to do constitutes ineffective assistance of counsel even when the lost appeal may not have had a reasonable probability of success. *See Roe v. Flores–Ortega,* 528 U.S. at 477–78, 120 S.Ct. 1029; *Martin v. United States,* 81 F.3d 1083, 1084 (11th Cir.1996); *Castellanos v. United States,* 26 F.3d 717, 719 (7th Cir.1994); *United States v. Peak,* 992 F.2d 39, 42 (4th Cir.1993); *United States v. Eli,* 227 F.Supp.2d 90, 99 (D.D.C.2002). Furthermore, an attorney who does appeal and ably argues several grounds for reversal on appeal nevertheless is deficient in omitting an argument that would have resulted in reversal irrespective of the likely result of a retrial after reversal. *United States v. Cook,* 45 F.3d 388, 395 (10th Cir.1995). *See also Mayo v. Henderson,* 13 F.3d 528, 536 (2d Cir.1994) (prejudice prong satisfied if an argument not advanced by counsel on appeal would have resulted in a new trial); *Page v. United States,* 884 F.2d at 302 (characterizing prejudice inquiry as whether "the result of the [appeal] would have been different") (bracketed material in original). Thus, an attorney who provides deficient advice that causes the client unreasonably not to appeal a conviction or to lose his timely right to appeal has rendered ineffective assistance. A mistrial that is granted because of irremediable prejudice against the defendant is indistinguishable functionally from an appellate reversal of a conviction.[10]

9. In *Roe v. Flores–Ortega,* 528 U.S. at 484, 120 S.Ct. 1029, in which counsel failed to file a timely notice of appeal and thereby deprived the defendant of access to the appellate process, the Court stated the prejudice test as being whether "there is a reasonable probability that, but for counsel's deficien[cy] … he would have timely appealed." The defendant's likelihood of success on that appeal, or his success at retrial should his appeal be successful, was not a consideration. The defendant was denied the procedural right of the appeal; had he requested one in a timely manner, he would have been entitled to one. *Strickland* therefore does not require that a defendant show a reasonable probability of being acquitted at the new trial following appellate reversal of his conviction. *See id.*

Here, Mr. Palmer's failure to ask for a mistrial did not in itself deprive Mr. Ramsey of any procedural right. Only when it is determined that the Court would in fact have *granted* the motion did Mr. Palmer's deficiency deprive Mr. Ramsey of such a right. Because the Court would have granted the motion for a mistrial and defendant would have had an opportunity for a new trial unencumbered by incompetent counsel, he was prejudiced in the same way as the defendant in *Flores–Ortega.*

10. *Davidson v. United States,* 951 F.Supp. 555 (E.D.Pa.1996), also is instructive. In that case the court granted post-conviction relief to a defendant whose trial counsel failed to notify the judge that jurors had met and voted to convict the defendant even before the start of the defense case. The court held that counsel's failure, motivated by no reason other than ignorance that such action entitled his client to a mistrial, was deficient and satisfied the prejudice prong of *Strickland* because the client would have received the mistrial. *See id.* at 558–59. There was no consideration of the defendant's likelihood of success in the second trial which, if the jury's action was any indication, was quite remote.

■ The class of cases evaluating ineffective assistance claims in which counsel is alleged to have improperly advised or failed to advise clients concerning plea offers bolster the Court's conclusion. If counsel is deficient in advising a client of the consequences of going to trial as opposed to accepting a plea offer and the client decides to go to trial, the client has an ineffective assistance claim if he can demonstrate that he would have pleaded guilty if he had been represented by competent counsel. *See Hill v. Lockhart,* 474 U.S. at 56, 106 S.Ct. 366 (prejudice prong met if defendant demonstrates a reasonable probability that, but for counsel's errors, he would have pleaded guilty instead of going to trial). *See also United States v. Graham,* 91 F.3d 213, 218–20 (D.C.Cir. 1996); *United States v. Taylor,* 139 F.3d 924, 929–30 (D.C.Cir.1998); *United States v. Horne,* 987 F.2d 833, 835 (D.C.Cir.1993). *Accord Smith v. United States,* 348 F.3d at 551–52 (6th Cir.2003); *United States v. Blaylock,* 20 F.3d 1458, 1466–67 (9th Cir. 1994); *United States v. Day,* 969 F.2d 39, 44–45 (3d Cir.1992); *Toro v. Fairman,* 940 F.2d 1065, 1068 (7th Cir.1991). Conversely, where the ill-advised client pleads guilty when it was not in his best interests to do so, he establishes prejudice by showing that but for counsel's deficient performance a reasonable probability exists that the defendant would not have pleaded guilty and would have insisted on a trial. It is not necessary that he would have been acquitted after that trial. *See Hill v. Lockhart,* 474 U.S. at 59, 106 S.Ct. 366; *United States v. Hanson,* 339 F.3d 983,

990–92 (D.C.Cir.2003); *United States v. Horne,* 987 F.2d at 835. Both of these variations are relevant to Mr. Ramsey's case.

The *Hill* formulation—assessing whether the "plea process" would have been resolved differently—establishes that at least for pleas the question is not ultimate guilt but process. Under *Hill,* "a plea based upon advice of counsel that 'falls below the level of reasonable competence such that the defendant does not receive effective assistance' is neither voluntary nor intelligent," and thus is based on the constitutionally deficient assistance of counsel. *United States v. McCoy,* 215 F.3d 102, 107 (D.C.Cir.2000) (quoting *United States v. Loughery,* 908 F.2d 1014, 1019 (D.C.Cir.1990)). *Hill* thus provides support for Mr. Ramsey's position that the only prejudice that need be shown is the lost opportunity to receive a second trial.

Admittedly, pleas are different from mistrials in at least two respects. First, a decision to plead guilty waives myriad procedural protections, most notably the rights against compelled self-incrimination and trial by jury. By contrast, a decision not to move for a mistrial affects none of those rights. It simply is a decision as to whether one's chances of a fair trial with the first jury have been so impaired that it would be appropriate to ask for another. Second, and quite possibly for the reason underlying the first difference, a decision to plead guilty rests with the defendant alone, while the decision to request a mistrial rests primarily with counsel.[11] Nev-

11. The Supreme Court in *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), stated in dictum that a criminal defendant has the right personally to make certain decisions about his defense, including "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." The decision to request (or not to request) a mistrial was not then, and has never since become, an item on that list. *See United States v. Burke,* 257 F.3d 1321, 1323–24 (11th Cir.2001); *United States v. Washington,* 198 F.3d 721, 723 (8th Cir.1999); *Walker v. Lockhart,* 852 F.2d 379, 382–83 (8th Cir.1988); *see also United States v. Boyd,* 86 F.3d 719, 723 (7th Cir.1996). Counsel's discretion in that

ertheless, the D.C. Circuit has held that an ineffective assistance claim may succeed if the defendant can show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *United States v. Taylor*, 139 F.3d at 929–30 (quoting *Hill v. Lockhart*, 474 U.S. at 59, 106 S.Ct. 366). *See also United States v. Calderon*, 163 F.3d 644, 646 (D.C.Cir.1999). In this context, all that must be shown is a " 'reasonable probability' . . . 'sufficient to undermine confidence' in the defendant's decision to plead guilty." *United States v. McCoy*, 215 F.3d at 107 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

Even more analogous are the plea cases that allow defendants to make out ineffective-assistance claims when they were advised *not* to accept a plea offer and go to trial instead. In this case, Mr. Ramsey went to trial on a case his counsel later claimed was "unwinnable," one now characterized as "difficult," and one the Court believes would not give him a reasonable probability of acquittal on retrial. Under the circumstances, any reasonably competent counsel would have stressed to Mr. Ramsey the advantages of moving for a mistrial in order to start the process anew and then pleading guilty. *See Toro v. Fairman*, 940 F.2d at 1068.

Mr. Palmer has testified that the prosecution was not offering much of a deal when he discussed a plea in advance of trial. But the first trial had proved so disastrous for the defendant—in part because of the missteps of his counsel—that there was no downside in seeking a mistrial to reopen plea discussions. Even if there was no bargain to strike with the prosecution, Mr. Ramsey still would have been better off to plead to the indictment, and thereby take advantage of the two-level (or possibly three-level) reduction in offense level under the Guidelines for acceptance of responsibility. *See* note 5 *supra*. Mr. Palmer's failure to move for a mistrial and then to advise his client to plead guilty constituted ineffective assistance of counsel. Mr. Ramsey's testimony at the Section 2255 hearing coupled with the decrease in the sentence he could have expected from the two-level reduction establishes a reasonable probability that he would have pleaded guilty.[12] He therefore is entitled to relief.

For the foregoing reasons, the Court finds that Mr. Ramsey's conviction was obtained through a denial of his Sixth Amendment right to the effective assistance of counsel. Mr. Palmer's performance was deficient, particularly, but not exclusively, in his failing to move for a mistrial, failing to research the law with respect to the defense he intended to offer to the charge, failing to review the Cobb file, and failing to advise Mr. Ramsey of the substantial advantages of aborting the trial and pleading guilty in view of the strength of the government's case. Not moving for a mistrial to afford counsel the opportunity to discuss the advantage of a plea after hearing all of the evidence and

area, however, provides no exemption from a claim of ineffective assistance of counsel where, as here, the decision not to request a mistrial was so unreasonable as to exceed that discretion.

12. At the Section 2255 hearing, Mr. Ramsey testified that Mr. Palmer had never told him that the case was unwinnable. Mr. Ramsey further testified that had he been advised that the case was unwinnable, he would have pleaded guilty to receive the offense-level adjustment. Although self-serving, Mr. Ramsey's testimony is credible in alleging that Mr. Palmer did not sufficiently advise Mr. Ramsey of the benefits of pleading guilty. Because the case was so difficult for the defense, the Court concludes that there was a reasonable probability that Mr. Ramsey would have pleaded guilty if he had been properly advised.

realizing that an entrapment defense could not be mounted was incompetent. Mr. Ramsey has shown prejudice by demonstrating a reasonable probability that a mistrial would have been requested if he had been represented by competent counsel and by demonstrating a reasonable probability that the Court would have granted a mistrial if one were requested.

Mr. Ramsey's motion for relief under 28 U.S.C. § 2255 is granted. His conviction and sentence are vacated and a new trial is ORDERED. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

### ORDER

For the reasons set forth in this Court's Opinion issued this same day, it is hereby

ORDERED that the defendant's motion for relief under 28 U.S.C. § 2255 is GRANTED; and it is

FURTHER ORDERED that the defendant's conviction and sentence are VACATED, and a new trial is ordered.